MARLA OWENS, Petitioner-Appellant, v. THE DEPARTMENT OF HUMAN
RIGHTS *et al.*, Respondents-Appellees.

First District (3rd Division)   No. 1—04—1620

Opinion filed March 16, 2005.

Richard J. Gonzalez, of Chicago-Kent College of Law, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Carl J. Elitz, Assistant Attorney General, of counsel), for appellees.

JUSTICE SOUTH delivered the opinion of the court:

Petitioner, Marla Owens, brings this petition for review of an order of Raymundo R. Luna, chief legal counsel of the Illinois Department of Human Rights (Department), which sustained the Department's dismissal of her charge of unlawful discharge based upon handicap discrimination against her former employer, respondent AT&T Corporation. 775 ILCS 5/8—111(A)(1) (West 2002); 155 Ill. 2d R. 335.

Petitioner's charge of discrimination alleged that she had been employed by respondent for 23 years and always performed her job adequately; that in March 2001 she was transferred from a downtown Chicago location to Rolling Meadows, which required her to drive 50 miles in one direction; that she developed a disabling medical condition which consisted of congestive heart disease, hypertension, chronic obstructive pulmonary disease and sleep apnea; that due to this medical condition, she could not safely drive the 50-mile commute to Rolling Meadows; that she requested reasonable accommodations from respondent, which included a transfer back to a Chicago location; that against her doctor's orders, she drove to Rolling Meadows for a while but required periodic disability leaves; that she was terminated from her employment on June 21, 2002; that respondent's stated reason for the termination was "job abandonment"; and that it was her belief that she had been discriminated against on the basis of her disability.

In its verified response, respondent-employer admitted petitioner's length of employment and date of discharge; neither confirmed nor denied her medical condition or inability to safely drive the 50-mile commute; and denied all remaining allegations.

The Department conducted an investigation of the charges. As part of that investigation, several witnesses were interviewed. Among these witnesses were respondent's senior equal opportunity specialist, a department manager, and the administrative support manager, all of whom confirmed that petitioner was transferred to Rolling Meadows on April 2, 2001, due to a "work imbalance" and that she requested to be transferred back to a Chicago location due to a medical condition. She took two disability leaves, the second of which was in December 2001. She was released to go back to work by her physician on June 17, 2002. However, because she failed to return on that date, respondent considered her as having resigned. MetLife, respondent's disability insurance carrier that handles its health affairs, receives all of an employee's medical documentation and advises respondent when an employee is on medical leave and when he or she is scheduled to return. However, per company policy, respondent is never advised by MetLife as to an employee's medical condition but only as to whether he or she has certain restrictions and, if so, what those restrictions are.

Robert Mroz, an AT&T manager, stated that when petitioner approached him on April 2, 2001, requesting a transfer because of the long drive from her home to Rolling Meadows, he advised her that she could look into AT&T's transfer system for a lateral transfer or promotion as long as she was qualified for the position. He did not know the nature of petitioner's medical condition due to respondent's policy, and she never told him.

Judi Thomas, respondent's administrative support manager, stated that on August 28, 2001, petitioner approached her after coming off of her first medical leave and told her that she wanted to be transferred back to Chicago because the drive was too far. Thomas also did not know the nature of petitioner's medical condition due to the above-stated company policy, and petitioner never told her. Thomas referred her to the company transfer system and told her that she was free to seek a transfer. She also provided petitioner with information on van pooling and was advised that another employee had offered to drive her to work.

Thomas stated that petitioner took a second disability leave in December 2001 and was scheduled to return on June 17, 2002, after she (Thomas) received a telephone call from a MetLife representative advising her that petitioner no longer had any medical restrictions. She received a message from petitioner that she was not coming back because she could not drive the distance, and she did not tell her when she would be coming back. On June 18, 2002, Thomas sent petitioner a letter advising her that since she had been released to return to

work, she was scheduled to be there on or before June 21, 2002, or would be considered as no longer wanting the job. When petitioner failed to return to work on that date, Thomas sent her a letter dated June 21, 2002, informing her that she was being "let go" because of her failure to return to work.

In rebuttal, petitioner stated that she did, in fact, tell Mroz and Thomas that the reason she wanted to be transferred back to Chicago was because of a heart condition which caused her to fall asleep, and that driving 50 miles to work would be difficult for her. She further stated that they advised her that she could be transferred at any time as long as AT&T had a position for which she was qualified at that location. She searched the transfer system on respondent's computer at least twice a week but discovered there were no positions available for which she was qualified. According to petitioner, AT&T constantly had layoffs for her particular job title, so using the transfer system was ineffective since no positions were available for her at closer locations.

Petitioner confirmed that while she was on her second disability leave, MetLife contacted her on June 13, 2002, and told her that she was due to report to work on June 17, 2002, but that instead of reporting, she called the attendance hot line and left a message for her immediate supervisor that she could not come in because she was afraid to drive due to her medical condition. She admitted she never told her supervisor when she would be returning and that she received a warning letter advising her that she had to return to work on or before June 21, 2002, or be considered as no longer wanting the job. She had no further contact with respondent after receiving the June 21, 2002, letter advising her that she had been removed from the payroll due to her failure to return to work.

Petitioner further stated that while her doctor did release her to go back to work, he also advised her that she could not work "under the circumstances of driving so far, " and that the reason she did not go back to work on June 21, 2002, was because he had advised her that she could not drive the long distance. She admitted that she did not make it clear to respondent what her medical conditions were. She also submitted a medical report from her physician indicating final diagnoses of pulmonary hypertension, morbid obesity, hypertension and congestive heart failure.

In surrebuttal, respondent stated that petitioner was never "discharged" but was considered as "having resigned" when she failed to return to work after she was cleared with no restrictions.

On December 8, 2003, the Department issued a "Notice of Dismissal For Lack of Jurisdiction" (count a) and "Lack of Substantial

Evidence" (count b). The investigation report bifurcated the charge into two allegations: (a) discharge in lieu of accommodation/physical handicaps, congestive heart disease, hypertension, and sleep apnea; and (b) discharge in lieu of accommodation/chronic obstructive pulmonary disease. A finding of lack of substantial evidence was made as to count (a) even though the report acknowledged that congestive heart disease, hypertension and sleep apnea are handicaps within the definition of the Act and were supported by medical documentation. As to count (b), the report found that petitioner's medical condition of chronic obstructive pulmonary disease was not a handicap within the definition of the Act because it was not supported by medical documentation and that, therefore, the Department lacked jurisdiction over that particular allegation of the charge.

The report set out the following uncontested facts: (a) respondent AT&T provides worldwide telecommunicating services to the public; (b) petitioner went on disability leave and was notified on June 13, 2002, that she had been released to return to work on June 17, 2002; (c) petitioner was hired on "November 31 [*sic*], 1978," and her position of reports clerk with respondent ended on June 21, 2002.

As to the first allegation, there was a finding of lack of substantial evidence of discrimination based upon the following uncontested facts:

"(1) Respondent has a transfer policy to which it strictly adhere[s]. [Petitioner] is aware of the policy;

(2) It is an uncontested fact that [Petitioner] was told that she could transfer to another location to work if it was available;

(3) [Petitioner] concedes that she does not think she made it clear to Respondent what her medical condition was;

(4) It is an uncontested fact that [Petitioner] indicated that she was not coming to work because she was afraid to make the long drive due to her medical condition after Respondent instructed her to return to work;

(5) [Petitioner] was released to return to work with no restrictions as of June 17, 2002;

(6) Respondent instructed [Petitioner] to return to work by June 21, 2002, or she would be considered as having resigned;

(7) [Petitioner] failed to report to work by June 21, 2002, as instructed."

As to the second allegation, the investigative report found a lack of jurisdiction on the grounds that petitioner's condition was insubstantial because no medical documentation was provided to show that the condition existed, and for that reason it did not meet the definition of a handicap under the Act.

On November 14, 2003, the investigations supervisor of the charge processing division, after reviewing the file and investigation report,

concurred with the report and determined that the investigator did not rely on "an assessment of the credibility of the witnesses."

Subsequently, petitioner filed a request for review asking that the dismissal of her charge be reviewed by the chief legal counsel of the Department.

On May 24, 2004, the chief legal counsel entered an order sustaining the dismissal of the charge for lack of substantial evidence and lack of jurisdiction. After recapping the above-referenced statements and the documentation that was submitted, the order stated that as to count (a) the investigation did not reveal, and the evidence did not show, a nexus between petitioner's handicap condition and respondent's decision to discharge her, and that she was not discharged in lieu of providing her with a reasonable accommodation. As to count (b), the order stated that petitioner's condition of chronic obstructive pulmonary disease was not a handicap within the meaning of the Human Rights Act (775 ILCS 5/1—101 *et seq.* (West 2002)) because she failed to provide the Department with medical documentation regarding that alleged handicap. In conclusion, the order stated:

> "In the final analysis, [petitioner] fails to establish, and the Department's investigation fails to show, that Respondent discharged [petitioner] in lieu of providing her with a reasonable accommodation. Further the Department does not have jurisdiction over Count B of [the] charge."

This petition for review followed.

Petitioner has raised the following issues for our review: (1) whether the Department misinterpreted and misapplied Illinois law regarding an employer's duty to reasonably accommodate; (2) whether the Department violated the federal court injunction of *Cooper v. Salazar*, 196 F.3d 809 (7th Cir. 1999), by making material credibility determinations in favor of AT&T and against petitioner; and (3) whether the Department applied an erroneously high standard to the determination of "substantial evidence."

■ The Department is authorized to dismiss a civil rights violation for lack of substantial evidence. 775 ILCS 5/7A—102(D)(2)(a) (West 2002). Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance. 775 ILCS 5/7A—102(D)(2) (West 2002).

The chief legal counsel possesses the same reviewing authority as was formerly assigned to the Human Rights Commission. *Folbert v. Department of Human Rights*, 303 Ill. App. 3d 13, 19 (1999). Therefore, the appropriate standard of review is whether the chief legal counsel abused his discretion in sustaining the Department's dismissal of a

civil rights violation. *Traficano v. Department of Human Rights*, 297 Ill. App. 3d 435 (1998). The reviewing court cannot reweigh the evidence or substitute its judgment for that of the trier of fact, here, the Department. *Roedl v. Midco International*, 296 Ill. App. 3d 213 (1998).

■ To establish a *prima facie* case of discrimination, the claimant must show by a preponderance of the evidence that: (1) she is a member of a protected class; (2) she was performing satisfactorily; (3) she was discharged despite the adequacy of her work; and (4) a similarly situated employee who was not a member of the protected group was not discharged. *Marinelli v. Human Rights Comm'n*, 262 Ill. App. 3d 247, 253-54 (1994). Once a claimant satisfies a *prima facie* case, the employer must articulate, not prove, a legitimate, nondiscriminatory basis for its action. *Alcequeire v. Human Rights Comm'n*, 292 Ill. App. 3d 515, 520 (1997).

The burden then shifts back to the claimant to prove by a preponderance of the evidence that the employer's articulated reason was not its true reason but was in fact a pretext for unlawful discrimination. *Alcequeire*, 292 Ill. App. 3d at 520. The failure of a claimant to present substantial evidence of a *prima facie* discrimination claim or to disprove an employer's articulated reason for discharge warrants dismissal of the charge. *Alcequeire*, 292 Ill. App. 3d at 520.

■ The Illinois Human Rights Act (Act) (775 ILCS 5/1—101 *et seq.* (West 2002)) provides that an individual may be protected by it when he or she has a determinable physical characteristic which results from a disease and which is unrelated to his or her ability to perform a particular job or function, or when his or her condition is perceived as a handicap. *Illinois Bell Telephone Co. v. Human Rights Comm'n*, 190 Ill. App. 3d 1036, 1046 (1989). The pertinent provision of the Act defines a handicap as:

> "[A] determinable physical or mental characteristic of a person *** which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic:
> (1) *** is unrelated to the person's ability to perform the duties of a particular job or position ***." 775 ILCS 5/1—103(I)(1) (West 2002).

Thus, the plain language of section 1—103(I) provides that an individual may be protected by the Act when he or she has a determinable physical characteristic which results from a disease and which is unrelated to his or her ability to perform a particular job or function, or when his or her condition is perceived as a handicap. *Illinois Bell Telephone Co.*, 190 Ill. App. 3d at 1046.

The supreme court construed "handicap" to include at least those

individuals whose condition in fact hindered them from engaging in major life activities, and "major life activity" encompasses employment. *Lyons v. Heritage House Restaurants, Inc.*, 89 Ill. 2d 163, 170 (1982).

In this case, the chief legal counsel found as to count (a) no evidence that respondent discharged petitioner because of her medical condition but, rather, that she was discharged because she failed to go back to work after being given a medical release by both MetLife and her primary care physician. On this factual point, the evidence is undisputed that petitioner's medical condition did not impact her ability to do her job as a reports clerk whether she was in Rolling Meadows or Chicago. Petitioner has never claimed that her chronic obstructive pulmonary disease, for example, or sleep apnea in any way affected her ability to perform her job responsibilities. According to petitioner, she always performed her job adequately during the 23 years she was employed by respondent. Her physician's report also indicates that she was able to return to her regular duties, with the proviso, of course, that she could not "safely drive" the 50-mile commute from her home to Rolling Meadows. Furthermore, the evidence is undisputed that there were no positions available in petitioner's job title. According to petitioner, she, herself, searched respondent's transfer system and was unable to find a position available in her job title in Chicago. Petitioner's physical limitations with respect to driving had no bearing on her ability to do her job at work.

Based upon the record and the undisputed facts, we find that petitioner was discharged for a nondiscriminatory reason, *i.e.*, her refusal to return to work after being medically cleared, and that she was not transferred back to Chicago because no positions were available in her job title.

■ However, there is a more fundamental issue that we are required to address and that is whether the Act requires an employer such as respondent to reasonably accommodate an employee with commuting problems. Under the Department's interpretive rules, an employer must provide reasonable accommodation for known physical limitations of otherwise qualified handicapped employees, unless the employer can demonstrate that such accommodation would be prohibitively expensive or would unduly disrupt the ordinary conduct of business. 56 Ill. Adm. Code § 2500.40, as amended by 6 Ill. Reg. 11489 (September 15, 1982). The employee bears the burden of asserting the duty to accommodate; showing that an accommodation was, in fact, requested; and demonstrating that accommodation was necessary for adequate performance. *Department of Corrections v. Human Rights Comm'n*, 298 Ill. App. 3d 536, 541 (1998). In Illinois, the duty to ac-

commodate only requires employers to accommodate a handicapped employee in the employee's present position for which she was hired. *Fitzpatrick v. Human Rights Comm'n*, 267 Ill. App. 3d 386, 392 (1994).

We find no Illinois cases directly on point, so we must look to other jurisdictions for some guidance.

In *Salmon v. Dade County School Board*, 4 F. Supp. 2d 1157 (S.D. Fla. 1998), a case that was brought under the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12111(8) (1994)), the plaintiff, a guidance counselor for the school board, suffered from a permanent partial disability of chronic lumbosacral strain, which caused back pain. After driving her car for long periods of time, she needed to stretch and rest her back. She complained that the heavy morning traffic exacerbated her back problems and asked to be transferred to a school that would afford her a shorter commute. In upholding the lower court's grant of summary judgment in favor of the board, which denied her request, the court held:

> "[P]laintiff's commute to and from work is an activity that is unrelated to and outside of her job. While an employer is required to provide reasonable accommodations that eliminate barriers *in* the work environment, an employer is not required to eliminate those barriers which exist *outside* the work environment." (Emphasis in original.) *Salmon*, 4 F. Supp. 2d at 1163.

In *Bull v. Coyner*, No. 98 C 7583 (February 23, 2000), another ADA case, the plaintiff was employed as a part-time cable intern for a public cable access television station. He suffered from retinitis pigmentosa, which is a degenerative eye disease that rendered him legally blind and, consequently, unable to drive. Therefore, station employees, while on company time, often drove him to and from work. When the defendant-employer learned that its employees were driving plaintiff to and from work on company time, the practice was prohibited. Defendant also changed plaintiff's schedule so that he had to work nights, even though it was a hardship because of his vision problems. In upholding summary judgment in favor of the defendant, the court held:

> "Accommodations are directed at enabling an employee to perform the essential functions of a job. [Citation.] Activities that fall outside the scope of the job, like commuting to and from the workplace, are not within the province of an employer's obligations under the ADA. After all, the ADA addresses discrimination with respect to any 'terms, condition or privilege of employment.' [Citation.] [Defendant], with full knowledge of Bull's vision problems, may have been insensitive or even malicious in requiring him to work at night. But [it] had no legally-imposed obligation to be thoughtful and certainly no duty to require [its] employees to drive

Bull on company time. Therefore, Defendants cannot be charged under the ADA with the duty of providing for Bull's transportation." (Emphasis omitted.) *Bull*, slip op. at 9.

■ Similarly, in the instant case, petitioner was asking respondent to accommodate her with a commuting problem, not with any problems that existed within the workplace. There is no allegation that petitioner was unable to do her job once she got to the workplace in Rolling Meadows. While we can appreciate petitioner's concerns for her physical well-being given her physician's advice, those are concerns with which respondent cannot be involved.

In support of her position, petitioner cites *Illinois Bell Telephone Co. v. Human Rights Comm'n*, 190 Ill. App. 3d 1036 (1989). In that case, this court affirmed a decision of the Illinois Human Rights Commission that Illinois Bell unlawfully discriminated against its employee in discharging her because of excessive absenteeism occasioned by her endometriosis disease handicap and of its unreasonable failure to accommodate her handicap. In that case, the complainant, a central office technician, was transferred from a department which utilized a flexible, nonscheduled days system to a department which did not utilize the nonscheduled days system. Her attendance deteriorated once she was placed in the unit that did not utilize the flexible, nonscheduled days system, which was in large part due to her employer's refusal to transfer her into a unit that utilized the flexible days system. This court found that Illinois Bell failed to implement the required reasonable accommodation which would have permitted its employee to rectify her attendance problem and overcome her handicap, since the record revealed that the duties in the two units were not significantly different or particularly unfamiliar to the employee, since she had worked in both units, and that placing her in a unit that utilized the flexible, nonscheduled days would have provided her with the means of scheduling around the predictable days when she would be disabled. *Illinois Bell*, 190 Ill. App. 3d at 1050. This court went on to say:

"There is ample evidence to support the Commission's findings that placing complainant in one of the toll department units that utilized the 'non-schedule days' system would not have been overly expensive or unduly disrupt petitioner's business. The mechanism for accommodating complainant's handicap was already in place." *Illinois Bell*, 190 Ill. App. 3d at 1051.

However, *Illinois Bell* does not address the unique facts of this case with respect to commuting problems. While the Act requires an employer to reasonably accommodate an employee in his or her workplace, it does not require an employer to accommodate an

employee outside the workplace or to accommodate what are essentially commuting problems. Were we to hold otherwise, we would be unduly expanding an employer's obligations to reasonably accommodate its employees under the Act and would be placing an undue burden upon employers to work with employees who have problems outside the workforce that may or could impact their ability to get to that workplace. The issue in *Illinois Bell* was the feasibility of transferring the claimant from one shift to another within the office workplace, which would have reasonably accommodated her disability. In this case, petitioner does not deny that she could have reached Rolling Meadows via public transportation but that it would have necessitated her getting up at 4 in the morning in order to reach the office in a timely fashion. Nonetheless, respondent was not required to accommodate petitioner with problems that arose outside the work environment. Petitioner has never alleged that once she reached Rolling Meadows she was unable to do her job.

As to count (b), discharge in lieu of accommodation/physical handicap, chronic obstructive pulmonary disease, a finding of lack of jurisdiction was made on the grounds that petitioner's condition is considered insubstantial "because no medical documentation was provided to show that the condition exists." However, we must disagree with that assessment because contained in the record is a handwritten letter from Dr. Robyn Jackson Flagg, petitioner's physician, dated April 11, 2001, which lists among the other conditions "chronic obstructive pulmonary disease." Therefore, contrary to the above-finding, there was medical documentation supporting petitioner's claim of disability. However, for the reasons enumerated above, respondent was under no duty to accommodate petitioner as alleged in that count as well. This court may affirm on any basis supported by the record. *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983).

We should also mention that the Department's findings were based upon uncontested, not contested, facts. For that reason, we need not address petitioner's remaining issues.

Accordingly, the finding of the chief legal counsel is confirmed.

Confirmed.

KARNEZIS, P.J., and HOFFMAN, J., concur.